1  **JODI DENISE THORP**
California State Bar No. 223667
2  427 "C" Street, Suite 300
San Diego, California  92101
3  Telephone:  (619) 233-3169
Fax: (619) 223-3569
4  email: jodithorp@thorplawoffice.com

5  Attorneys for Fidencio Duarte-Hernandez

6

7

8                        UNITED STATES DISTRICT COURT

9                       SOUTHERN DISTRICT OF CALIFORNIA

10                        **(HONORABLE JEFFREY T. MILLER)**

11  UNITED STATES OF AMERICA,        )        CASE NO. 07CR3343-JM
                                     )
12          Plaintiff,               )        STATEMENT OF FACTS AND
                                     )        MEMORANDUM OF POINTS AND
13                                   )        AUTHORITIES IN SUPPORT OF
                                     )        DEFENDANT'S MOTIONS.
14                                   )
    v.                               )
15                                   )
    FIDENCIO DUARTE-HERNANDEZ,       )
16                                   )
            Defendant.               )
17                                   )

18

19                                    **I.**

20                            **FACTUAL HISTORY**[1]

21          On October 23, 1987, Mr. Duarte-Hernandez was admitted to the United States.  Two

22  years later, on August 21, 1989, Mr. Duarte-Hernandez earned his legal permanent resident

    card.

23

24          In September of 2006, Mr. Duarte was charged under California Penal Code with

25  Arson of the Property of Another.  Mr. Duarte pled guilty before Judge Ellison with a plea

26  agreement that provided that his attorney would argue for probation with a sixteen month lid.

27  _____

28  [1]The following facts are based on information provided by the government.  Mr. Duarte does
    not admit their accuracy and reserves the right to challenge them.

1   RT Change of Plea 2.  Mr. Duarte at that time indicated that he had papers to be in the United

2   States.  The prosecutor verified that there was not any damage other than a loss of trash or

3   leaves and some charring of the garbage can.  TR Change of Plea 6.  Mr. Duarte stated at the

4   time of his guilty plea that a promise that was made to him was that they would try to get him

5   enrolled in a program.  Without admitting any specific conduct, Mr. Duarte entered into a

6   *People v. West* plea.  TR Change of Plea 7.

7         At the time of his sentencing, Mr. Duarte was represented by a different public

8   defender than had assisted him with his guilty plea.  TR RPO Judgment 1.  The court

9   indicated that it would allow Mr. Duarte's attorney an opportunity to find a treatment

10   program that would satisfy the concerns of the People or it would accept the 16-month

11   mitigated term.  TR RPO Judgment 5.  The court told the attorney that he wanted her to tell

12   Mr. Duarte that he already had 331 days credit for time served and that he would have to

13   waive those credits to go into a treatment program.  TR RPO Judgment 6.  The court

14   indicated that in terms of actual custody time, he may be better off doing the straight 16

15   months.  *Id*.  Mr. Duarte, after speaking with his counsel, indicated he was prepared to accept

16   the 16 months.  *Id*.  The court advised that he would have 2 ½ months left to serve and

17   sentenced Mr. Duarte to 16 months custody.  *Id*. at 7.

18         In subsequent immigration proceedings, on November 8, 2007, the immigration judge

19   found that Mr. Duarte's California prior for arson was an aggravated felony and ordered him

20   deported on that basis.

21         On November 13, 2007, at the Otay Mesa Port of Entry Primary Inspection Booth, Mr.

22   Duarte allegedly sought entry into the United States using his accurate personal information

23   and by providing his Legal Permanent Resident Card I-551.  Mr. Duarte was arrested and

24   charged with attempted reentry in violation of 8 U.S.C. §1326.  He was arraigned on

25   December 13, 2007, on an indictment handed up by the January 2007 Grand Jury, and he

26   pled not guilty.

27

28                         2               07cr3343-JTM

## II.

## MOTION TO DISMISS INDICTMENT DUE TO MISINSTRUCTION

### A. Introduction

The indictment in this case was returned by the January 2007 grand jury.  That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  *See Reporter's Partial Transcript of the Proceedings*, dated January 11, 2007.[2]  Judge Burns' instructions deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[3]

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, *see* Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." *See id.* at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment

---

[2]The following motion has been litigated extensively in this district.  District Judge Barry Ted Moskowitz entered a written decision on this motion in *United States v. Martinez-Covvarrubias*, No. 07cr0491-BTM.  Given the size of the transcripts under consideration, and as both the government and the Court likely have these transcripts, Mr. Duarte has **not** attached either of the two transcripts he cites to in this motion.  The first transcript referred to is the *Reporter's Partial Transcript of the Proceedings*, dated January 11, 2007.  Mr. Duarte refers to this transcript as "Exhibit A" throughout this motion.  The second transcript cited to by Mr. Duarte is the *Partially redacted, transcripts of the grand jury impanelment proceedings*.  Mr. Duarte refers to this transcript as "Exhibit B" throughout this motion.  If the Court prefers, Mr. Duarte is happy to provide a copy of these transcripts.

[3]  *See, e.g.*, *United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006); *United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir.) (en banc), *cert. denied*, 126 S. Ct. 736 (2005) (*Navarro-Vargas II*); *United States v. Navarro-Vargas*, 367 F.3d 896 (9th Cir. 2004)(*Navarro-Vargas I*); *United States v. Marcucci*, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[4]  *See also id.* at 20 ("You're all about probable cause.").

3                                    07cr3343-JTM

1  made by Congress, then your option is not to say 'well, I'm going to vote against indicting

2  even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even

3  though the evidence may be insufficient.'" *See id.* at 8-9.  Thus, the instruction flatly bars the

4  grand jury from declining to indict because the grand jurors disagree with a proposed

5  prosecution.

6        Immediately before limiting the grand jurors' powers in the way just described, Judge

7  Burns referred to an instance in the grand juror selection process in which he excused three

8  potential jurors.  *See id.* at 8.

9        I've gone over this with a couple of people.  You understood from the
         questions and answers that a couple of people were excused, I think three in
10       this case, because they could not adhere to the principle that I'm about to tell
         you.

11

12 *Id.*  That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect

   to their disagreement with Congress.  *See id.* at 8-9.  Thus, Judge Burns not only instructed
13
   the grand jurors on his view of their discretion; he enforced that view on pain of being
14
   excused from service as a grand juror.
15

16       For example, in one of his earliest substantive remarks, Judge Burns makes clear that

17 the grand jury's sole function is probable cause determination.

18       [T]he grand jury is determining really two factors: "do we have a reasonable
         belief that a crime was committed?  And second, do we have a reasonable
19       belief that the person that they propose that we indict committed the crime?"
         If the answer is "yes" to both of those, then the case should move forward.  If
20       the answer to either of the questions is "no," then the grand jury should not
         hesitate and not indict.

21 *See* Exhibit B at 8.[5]  In this passage, Judge Burns twice uses the term "should" in a context

22 that makes clear that the term is employed to convey instruction: "should" cannot reasonably

23 be read to mean optional when it addresses the obligation not to indict when the grand jury

24 has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that

25 the person that they propose that we indict committed the crime."

26       Equally revealing are Judge Burns' interactions with two potential grand jurors who

27 indicated that, in some unknown set of circumstances, they might decline to indict even

28

      [5]*Please see* footnote 2, *supra.*

07cr3343-JTM

1  where there was probable cause.  Because of the redactions of the grand jurors' names,

2  Mr. Duarte will refer to them by occupation.  One is a retired clinical social worker

3  (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The CSW

4  indicated a view that no drugs should be considered illegal and that some drug prosecutions

5  were not an effective use of resources.  *See id.* at 16.  The CSW was also troubled by certain

6  unspecified immigration cases.  *See id.*

7       Judge Burns made no effort to determine what sorts of drug and immigration cases

8  troubled the CSW.  He never inquired as to whether the CSW was at all troubled by the sorts

9  of cases actually filed in this district, such as drug smuggling cases and cases involving

10  reentry after deportation and alien smuggling.  Rather, he provided instructions suggesting

11  that, in any event, any scruples LCW may have possessed were simply not capable of

12  expression in the context of grand jury service.

13           Now, the question is can you fairly evaluate [drug cases and immigration
             cases]?  Just as the defendant is ultimately entitled to a fair trial and the person
14           that's accused is entitled to a fair appraisal of the evidence of the case that's in
             front of you, so, too, is the United States entitled to a fair judgment. If there's
15           probable cause, then the case should go forward.  *I wouldn't want you to say*,
             "well, yeah, there's probable cause, but I still don't like what our government
16           is doing.  I disagree with these laws, so I'm not going to vote for it to go
             forward."  If that is your frame of mind, the probably you shouldn't serve.
17           Only you can tell me that.

18  *See id.* at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge

19  Burns let the grand juror know that he would not want him or her to decline to indict in an

20  individual case where the grand juror "[didn't] like what our government is doing," *see id.*

21  at 17, but in which there was probable cause.  *See id.*  Such a case "should go forward."  *See*

22  *id.*  Given that blanket proscription on grand juror discretion, made manifest by Judge Burns'

23  use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even

24  if [the CSW] thought the evidence warranted it."  *See id.*  Again, Judge Burns' question

25  provided no context; he inquired regarding "a case," a term presumably just as applicable to

26  possession of a small amount of medical marijuana as kilogram quantities of

27  methamphetamine for distribution.  Any grand juror listening to this exchange could only

28

1 conclude that there was *no* case in which Judge Burns would permit them to vote "no bill"

2 in the face of a showing probable cause.

3      Just in case there may have been a grand juror that did not understand his or her

4 inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home

5 in his exchange with REA.  REA first advised Judge Burns of a concern regarding the

6 "disparity between state and federal law" regarding "medical marijuana."  *See id.* at 24.

7 Judge Burns first sought to address REA's concerns about medical marijuana by stating that

8 grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into

9 account.

10      Well, those things -- the consequences of your determination shouldn't concern
       you in the sense that penalties or punishment, things like that -- we tell trial
11      jurors, of course, that they cannot consider the punishment or the consequence
       that Congress has set for these things.  We'd ask you to also abide by that.  We
12      want you to make a business-like decision of whether there was a probable
       cause. ...

13

14 *Id.* at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors,

15 Judge Burns went on to suggest that REA recuse him or herself from medical marijuana

16 cases.  *See id.* at 25.

17      In response to further questioning, REA disclosed REA's belief "that drugs should be

18 legal."  *See id.*   That disclosure prompted Judge Burns to begin a discussion that ultimately

19 led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

20           I can tell you sometimes I don't agree with some of the legal decisions
        that are indicated that I have to make.  But my alternative is to vote for
21      someone different, vote for someone that supports the policies I support and
        get the law changed.  It's not for me to say, "well, I don't like it.  So I'm not
22      going to follow it here."
             You'd have a similar obligation as a grand juror even though you
23      might have to grit your teeth on some cases.  Philosophically, if you were a
        member of congress, you'd vote against, for example, criminalizing marijuana.
24      I don't know if that's it, but you'd vote against criminalizing some drugs.
             That's not what your prerogative is here.  You're prerogative instead
25      is to act like a judge and say, "all right.  This is what I've to  deal with
        objectively.  Does it seem to me that a crime was committed?  Yes.  Does it
26      seem to me that this person's involved?  It does."  *And then your obligation, if
        you find those to be true, would be to vote in favor of the case going forward.*

27

28

1  *Id.* at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part

2  test, which, if both questions are answered in the affirmative, lead to an "obligation" to

3  indict.

4        Having set forth the duty to indict, and being advised that REA was "uncomfortable"

5  with that paradigm, Judge Burns then set about to ensure that there was no chance of a

6  deviation from the obligation to indict in every case in which there was probable cause.

7        The Court: do you think you'd be inclined to let people go in drug cases even
         though you were convinced there was probable cause they committed a drug
8        offense?
         REA: It would depend on the case.
9        The Court: Is there a chance that you would do that?
         REA: Yes.
10       The Court: I appreciate your answers.  I'll excuse you at this time.

11
   *Id.* at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act
12
   solely on his political belief in decriminalization -- whether he or she would indict "depend[s]
13
   on the case," *see id.*, as it should.  Because REA's vote "depend[s] on the case," *see id.*, it is
14
   necessarily true that REA would vote to indict in some (perhaps many or even nearly all)
15
   cases in which there was probable cause.[6]  Again, Judge Burns made no effort to explore
16
   REA's views; he did not ascertain what sorts of cases would prompt REA to hesitate.  The
17
   message is clear: it does not matter what type of case might prompt REA's reluctance to
18
   indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the
19
   case going forward."  *See id.* at 27.  That is why even the "chance," *see id.*, that a grand juror
20
   might not vote to indict was too great a risk to run.
21
        In addition to his instructions on the authority to choose not to indict, Judge Burns
22
   also assured the grand jurors that prosecutors would present to them evidence that tended to
23
   undercut probable cause.  *See id.* at 20.[7]
24

25

26
        [6]  That fact belies the government's claim that Judge Burns excused only prospective jurors
27  who "expressed inability to apply the laws passed by Congress."  *See* Exhibit B at 8.

28       [7]  These instructions were provided in the midst of several comments that praised the United
   States attorney's office and prosecutors in general.

1
2
3
4
> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

5  *Id.* (emphasis added).[8]  The district court later returned to the notion of the prosecutors and

6  their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will

7  appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in

8  all matters presented to you." *See id.* at 27.

9        In the general instructions, Judge Burns posits a duty on the part of the prosecutor to

10 present to the grand jurors evidence that tended to undercut probable cause. *See* Ex. A at 20.

11
12
13
14
> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.

15 *Id.*  The antecedent to this instruction is also found in the impanelment.  After advising the

16 grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," *see*

17 Exhibit B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors

18 don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll

19 be informed of that. They have a duty to do that." *See id.*  Thus, Judge Burns unequivocally

20 advised the grand jurors that the government would present any evidence that was "adverse"

21 or "that cuts against the charge." *See id.*[9]

22

23
24
25
> [8]  The "in most instances" language suggests that there may be some limit on this principle. Again, counsel has ordered the full transcript, and it will likely resolve the question posed in the instant footnote.

26
27
28
> [9]  The impanelment instructions go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Exhibit B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." *See id.* at 43. *See also id.* at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict

**B. Argument**

> **i.        Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. *See Navarro-Vargas II*, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[10] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in *Navarro-Vargas II*.

For instance, with respect to the grand jury's relationship with the prosecution, the *Navarro-Vargas II* majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" *Navarro-Vargas II*, 408 F.3d at 1200 (quoting *Butz v. Economou*, 438 U.S. 478, 510 (1978)). *Accord Navarro-Vargas I*, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). *See also Navarro-Vargas II*, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, *id.*, but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." *Id.* *See* Niki Kuckes, *The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury*, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand

---

innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

[10]  *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

07cr3343-JTM

1  jury review from the perspective of those who insisted that a grand jury clause be included

2  in the Bill of Rights'") (quoting Wayne LaFave et al., *Criminal Procedure* § 15.2(g) (2d ed.

3  1999)).

4       Indeed, the *Navarro-Vargas II* majority agrees that the grand jury possesses all the

5  attributes set forth in *Vasquez v. Hillery*, 474 U.S. 254 (1986).  *See id.*

6

7       The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a

8       non-capital offense -- all on the basis of the same facts.  And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can

9       be obtained.'"

10  *Id.* (quoting *Vasquez*, 474 U.S. at 263).  The Supreme Court has itself reaffirmed *Vasquez*'s

11  description of the grand jury's attributes in  *Campbell v. Louisiana*, 523 U.S. 392 (1998),

12  noting that the grand jury "controls not only the initial decision to indict, but also significant

13  questions such as how many counts to charge and whether to charge a greater or lesser

14  offense, including the important decision whether to charge a capital crime."  *Id.* at 399

15  (citing *Vasquez*, 474 U.S. at 263).    Judge Hawkins notes that the *Navarro-Vargas II*

16  majority accepts the major premise of *Vasquez*: "the majority agrees that a grand jury has the

17  power to refuse to indict someone even when the prosecutor has established probable cause

18  that this individual has committed a crime." *See id.* at 1214 (Hawkins, J. dissenting).  *Accord*

19  *Navarro-Vargas I*, 367 F.3d at 899 (Kozinski, J., dissenting); *Marcucci*, 299 F.3d at 1166-73

20  (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong

21  support in the Ninth Circuit.  But not in Judge Burns' instructions.

22      **ii.    The Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

23

24       The *Navarro-Vargas II* majority found that the instruction in that case "leave[s] room

25  for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the

26  analysis in its previous decision in *Marcucci*.  *Marcucci* reasoned that the instructions do not

27  mandate that grand jurors indict upon every finding of probable cause because the term

28  "should" may mean "what is probable or expected."  299 F.3d at 1164 (citation omitted).

1  That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed

2  out.  *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

3  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible

4  'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional

5  independence.").  *See also id.* ("The 'word' should is used to express a duty [or] obligation.")

6  (quoting *The Oxford American Diction and Language Guide* 1579 (1999) (brackets in

7  original)).

8        The debate about what the word "should" means is irrelevant here; the instructions

9  here make no such fine distinction.  The grand jury instructions make it painfully clear that

10  grand jurors simply may not choose not to indict in the event of what appears to them to be

11  an unfair application of the law: should "you disagree with that judgment made by Congress,

12  then your option is not to say 'well, I'm going to vote against indicting even though I think

13  that the evidence is sufficient'...."  *See*  Ex. A at 8-9.  Thus, the instruction flatly bars the

14  grand jury from declining to indict because they disagree with a proposed prosecution. No

15  grand juror would read this language as instructing, or even allowing, him or her to assess

16  "the need to indict."  *Vasquez*, 474 U.S. at 264.

17        Nor does the *Navarro-Vargas II* majority's faith in the structure of the grand jury a

18  cure for the instructions excesses.  The *Navarro-Vargas II* majority attributes "[t]he grand

19  jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote

20  and the unreviewability of its decisions."  408 F.3d at 1200.  As a result, the majority

21  discounts the effect that a judge's instructions may have on a grand jury because "it is the

22  *structure* of the grand jury process and its *function* that make it independent."  *Id.* at 1202

23  (emphases in the original).

24        Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes

25  that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the

26  proceedings and unreviewability of many of its decisions -- sufficiently protects that power."

27  *See id.* at 1214 (Hawkins, J., dissenting).  The flaw in the majority's analysis is that

28  "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause

1  determination ... unconstitutionally undermines the very structural protections that the
2  majority believes save[] the instruction." *Id.* After all, it is an "'almost invariable assumption
3  of the law that jurors follow their instructions.'" *Id.* (quoting *Richardson v. Marsh*, 481 U.S.
4  200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors
5  could not possibly fulfill the role described in *Vasquez*. Indeed, "there is something
6  supremely cynical about saying that it is fine to give jurors erroneous instructions because
7  nothing will happen if they disobey them." *Id.*

8      In setting forth Judge Hawkins' views, Mr. Duarte understands that this Court may not
9  adopt them solely because the reasoning that supports them is so much more persuasive than
10 the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is
11 already untenable reasoning.

12     Here, again, the question is not an obscure interpretation of the word "should", but an
13 absolute ban on the right to refuse to indict that directly conflicts with the recognition of that
14 right in *Vasquez*, *Campbell*, and both *Navarro-Vargas II* opinions. *Navarro-Vargas II* is
15 distinguishable on that basis, but not only that.

16     Judge Burns did not limit himself to denying the grand jurors the power that *Vasquez*
17 plainly states they enjoy. He also apparently excused prospective grand jurors who might
18 have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case,
19 because they could not adhere to [that] principle...." *See* Ex. A at 8. The structure of the
20 grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no
21 longer there, likely because they expressed their willingness to act as the conscience of the
22 community. *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand
23 jury exercising its powers under *Vasquez* "serves ... to protect the accused from the other
24 branches of government by acting as the 'conscience of the community.'") (quoting *Gaither
25 v. United States*, 413 F.2d 1061, 1066 &  n.6 (D.C. Cir. 1969)). The federal courts possess
26 only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure,"
27 *United States v. Williams*, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned
28 his own rules and enforced them. The instructions here are therefore structural error.  *See*

1   *Navarro-Vargas II*, 408 at 1216-17 (Hawkins, J., dissenting).   The indictment must be

2   dismissed.

3         **iii.**      **The Instructions Conflict With *Williams*' Holding that there Is No Duty**
                    **to Present Exculpatory Evidence to the Grand Jury.**

4

5         In *Williams*, the defendant, although conceding that it was not required by the Fifth

6   Amendment, argued that the federal courts should exercise their supervisory power to order

7   prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such

8   disclosure required by Fifth Amendment common law.  *See* 504 U.S. at 45, 51.  *Williams*

9   held that "as a general matter at least, no such 'supervisory' judicial authority exists."  *See id.*

10  at 47.   Indeed, although the supervisory power may provide the authority "to dismiss an

11  indictment because of misconduct before the grand jury, at least where that misconduct

12  amounts to a violation of one of those 'few, clear rules which were carefully drafted and

13  approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'"

14  *id.* at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of

15  prosecutorial conduct in the first instance."  *Id.* at 47 (emphasis added).  The federal courts

16  possess only "very limited" power "to fashion, on their own initiative, rules of grand jury

17  procedure."  *Id.* at 50.  As a consequence, *Williams* rejected the defendant's claim, both as

18  an exercise of supervisory power and as Fifth Amendment common law.  *See id.* at 51-55.

19        Despite the holding in *Williams*, the instructions here assure the grand jurors that

20  prosecutors would present to them evidence that tended to undercut probable cause.  *See* Ex.

21  A at 20.

22        Now, again, this emphasizes the difference between the function of the grand
          jury and the trial jury.  You're all about probable cause.  If you think that

23        there's evidence out there that might cause you say "well, I don't think probable
          cause exists," then it's incumbent upon you to hear that evidence as well.  As

24        I told you, in most instances, *the U.S. Attorneys are duty-bound to present*
          *evidence that cuts against what they may be asking you to do if they're aware*

25        *of that evidence.*

26  *Id.* (emphasis added).   Moreover, the district court later returned to the notion of the

27  prosecutors and their duties, advising the grand jurors that they "can expect that the U.S.

28

1  Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll

2  act in good faith in all matters presented to you." *See id.* at 27.

3         This particular instruction has a devastating effect on the grand jury's protective

4  powers, particularly if it is not true.  It begins by emphasizing the message that *Navarro-*

5  *Vargas II* somehow concluded was not conveyed by the previous instruction: "You're all

6  about probable cause." *See* Ex. A at 20.  Thus, once again, the grand jury is reminded that

7  they are limited to probable cause determinations (a reminder that was probably unnecessary

8  in light of the fact that Judge Burns had already told the grand jurors that they likely would

9  be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors

10 that they should consider evidence that undercuts probable cause, but also advises the grand

11 jurors that the prosecutor will present it.  The end result, then, is that grand jurors should

12 consider evidence that goes against probable cause, but, if none is presented by the

13 government, they can  presume that there is none.  After all, "in most instances, the U.S.

14 Attorneys are duty-bound to present evidence that cuts against what they may be asking you

15 to do if they're aware of that evidence." *See id.*  Thus, if the exculpatory evidence existed,

16 it necessarily would have been presented by the "duty-bound" prosecutor, because the grand

17 jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid,

18 they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at

19 27.

20        These instructions create a presumption that, in cases where the prosecutor does not

21 present exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in

22 a case in which no exculpatory evidence was presented, would proceed along these lines:

23              (1) I have to consider evidence that undercuts probable cause.
               (2)  The candid, honest, duty-bound prosecutor would, in good faith,
24              have presented any such evidence to me, if it existed.
               (3)  Because no such evidence was presented to me, I may conclude
25              that there is none.

26 Even if some exculpatory evidence were presented, a grand juror would necessarily presume

27 that the evidence presented represents the universe of all available exculpatory evidence; if

28 there was more, the duty-bound prosecutor would have presented it.

1      The instructions therefore discourage investigation–if exculpatory evidence were out

2 there, the prosecutor would present it, so investigation is a waste of time–and provide

3 additional support to every probable cause determination: i.e., this case may be weak, but I

4 know that there is nothing on the other side of the equation because it was not presented.  A

5 grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

**III.**

**MOTION TO DISMISS INDICTMENT FOR FAILURE TO ALLEGE ELEMENTS**

**A.    Introduction**

9      The indictment must be dismissed because the government has failed to properly

10 allege all elements of the offense.  The Fifth Amendment requires that "[n]o person shall be

11 held to answer for a capital, or otherwise infamous crime, unless on a presentment or

12 indictment of a Grand Jury . . .."  Consistent with this Constitutional requirement, the

13 Supreme Court has held that an indictment must "<u>fully, directly, and expressly, without any</u>

14 <u>uncertainty or ambiguity</u>, set forth all the elements necessary to constitute the offense

15 intended to be punished."  *United States v. Carll*, 105 U.S. 611, 612-13 (1881) (emphasis

16 added).  It is black letter law that an indictment that does not allege an element of an offense,

17 even an implied element, is defective, and should be dismissed.  *See, e.g.*, *Russell v. United*

18 *States*, 369 U.S. 749, 769-72 (1962); *Stirone v. United States*, 361 U.S. 212, 218-19 (1960);

19 *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999); *United States v. Keith*, 605 F.2d

20 462, 464 (9th Cir. 1979).

21      First, the indictment charges a violation of Title 8, United States Code, Sections

22 1326(a) and (b).  In *United States v. Salazar-Lopez*, __ F.3d __, 2007 WL 3085906 at *2 (9th

23 Cir. Oct. 24, 2007), the Ninth Circuit indicated that to be sufficient, an indictment charging

24 a violation of section 1326(b) must allege either that the defendant has been previously

25 removed subsequent to a conviction (*i.e.,* for a misdemeanor, a felony, an aggravated felony,

26 or a crime of violence), or it must allege a specific date of the prior removal.  In this case, the

27 indictment only alleges that Mr. Duarte "was removed from the United States subsequent to

28 December 18, 2006."  The indictment does not allege either that this removal occurred

1  subsequent to a conviction or allege a specific date of the prior removal.  Therefore, because

2  the indictment does not allege all elements of section 1326(b), the indictment must be

3  dismissed.  Second, the indictment, although purportedly alleging a violation of sub-section

4  (b) of section 1326, does not allege that Mr. Duarte has suffered a prior conviction.

5  **B.    Failure to allege date of deportation, or its temporal relationship to a removal**

6          Mr. Duarte has a Fifth Amendment right to have a grand jury pass upon those facts

7  necessary to convict him at trial.  In the indictment, the government included the language:

8  "It is further alleged that defendant Fidencio Duarte-Hernandez, was removed from the

9  United States subsequent to December 18, 2006."[11]  The indictment in this case violates Mr.

10  Duarte's right to presentment in two ways.  First, the language added by the government does

11  not ensure that the grand jury actually found probable cause that Mr. Duarte was deported

12  after December 18, 2006, as opposed to simply being physically removed from the

13  United States.  Second, that the grand jury found probable cause to believe that Mr. Duarte

14  was removed "subsequent to December 18, 2006" does not address the possibility that the

15  government may at trial rely on a deportation that was never presented to, or considered by,

16  the grand jury.

17          The Fifth Amendment provides that "[n]o person shall be held to answer for a capital,

18  or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S.

19  Const. Amend. V.  The Sixth Amendment provides that "[i]n all criminal prosecutions the

20  accused shall enjoy the right . . . to be informed of the nature and cause of the accusation .

21  . .."  U.S. Const. Amend. VI.  Thus, a defendant has a constitutional right to have the charges

22  against him presented to a grand jury and to be informed of the grand jury's findings via

23  indictment.  *See Russell,* 369 U.S. at 763 (An indictment must "contain[] the elements of the

24

25

---

26          [11]  Presumably, the government added this language in an attempt to comply with the
    Ninth Circuit's decision in *United States v. Covian-Sandoval*, 462 F.3d 1090 (9th Cir. 2006).  In
27  *Covian-Sandoval*, the Ninth Circuit held that it is an *Apprendi* violation for a court to increase a
    person's statutory maximum under 8 U.S.C. § 1326(b) via a court-finding that a person had been
28  removed from the United States underlining following a conviction.  This language, however, does not cure the
    problems with this indictment.

1   offense intended to be charged, and sufficiently apprise[] the defendant of what he must be

2   prepared to meet.").

3           To be sufficient, an indictment must allege every element of the charged offense. *See*

4   *United States v. Morrison*, 536 F.2d 286, 287 (9th Cir. 1976) (citing United States v.

5   Debrow, 346 U.S. 374 (1953)).  Indeed, in order to be sufficient, an indictment must include

6   implied elements not present in the statutory language. *See Du Bo*, 186 F.3d at 1179.  "If an

7   element is necessary to convict, it is also necessary to indict, because elements of a crime do

8   not change as criminal proceedings progress." *United States v. Hill*, 279 F.3d 731, 741 (9th

9   Cir. 2002).  An indictment's failure to "recite an essential element of the charged offense is

10  not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the indictment." *Du*

11  *Bo*, 186 F.3d at 1179.

12          In the indictment, the government here has added the language:   "It is further alleged

13  that defendant Fidencio Duarte-Hernandez was removed from the United States subsequent

14  to December 18, 2006."  There is no indication from this "allegation" that the grand jury was

15  charged with the legal meaning of the word "removal" applicable in this context, as opposed

16  to being simply removed from the United States in a colloquial sense.   It is clear from

17  *Covian-Sandoval* that in order to trigger the enhanced statutory maximum contained in

18  section 1326(b), the government must prove that a person was removed—as that term is used

19  in the immigration context—after having suffered a conviction. 462 F.3d at 1097-1098

20  (noting as part of its analysis that immigration proceedings have fewer procedural protections

21  that criminal proceedings).  A deportation has the following elements: "(1) that a deportation

22  proceeding occurred as to [the] defendant and as a result, [(2)] a warrant of deportation was

23  issued and  [(3)] executed by the removal of the defendant from the United States."

24  *See United States v. Castillo-Basa*, 483 F.3d 890 (9th Cir. 2007) (citing, without contesting,

25  the elements of a deportation provided by the district court.)  As this is the type of removal

26  the government must prove before a petite jury, it is necessary that the government allege

27  such a removal before the grand jury.  As returned, however, there is no assurance from the

28

1  face of the indictment that the grand jury in this case was charged with the <u>type</u> of removal

2  necessary to increase a person's statutory maximum under section 1326(b).

3      As such, there is no fair assurance that the grand jury will have passed upon those

4  facts necessary to convict Mr. Duarte.  Additionally, as charged, there is no fair assurance

5  that the indictment will contain those allegations the government will attempt to prove at

6  trial.  If the government alleged before the grand jury that Mr. Duarte was removed (in a

7  colloquial sense), but offers proof at trial that Mr. Duarte was removed (in an immigration

8  sense), there will be a constructive amendment of the indictment at trial.  *See Stirone v.*

9  *United States*, 361 U.S. 212, 217-19 (1960).  Either scenario represents a violation of

10  Mr. Duarte's right to presentment.  *Stirone*, 361 U.S. at 218-19.

11      A second problem with the indictment is that there is no indication which (if any)

12  deportation the government presented to the grand jury.  In most cases, the government will

13  have a choice of deportations to present to the grand jury to support an allegation that a

14  person had been deported after a specific date.  This renders it a very real possibility that the

15  government alleged one deportation to the grand jury to sustain its allegation that Mr. Duarte

16  was removed from the United States, but will attempt to prove at trial a wholly different

17  deportation to sustain its trial proof.  If this were to turn out to be the case, Mr. Duarte's right

18  to have the grand jury pass on all facts necessary to convict him would be violated.  *See Du*

19  *Bo*, 186 F.3d 1179.

20  **C.    Failure to allege a prior conviction**

21      Although purportedly alleging a violation of sub-section (b) of section 1326, the

22  indictment here does not allege that Mr. Duarte has suffered a prior conviction.  Mr. Duarte

23  moves to dismiss the indictment on this basis.  Mr. Duarte recognizes that Ninth Circuit law

24  is contrary to his position.  *See Covian-Sandoval*, 462 F.3d at 1096-98.  He nonetheless raises

25  the issue to preserve his requested remedy—dismissal based on structural error.  *See United*

26  *States v. Salazar-Lopez*, No. 06-50438, __ F.3d __ (9th Cir. Oct. 24, 2007), *available as* 2007

27  U.S. App. Lexis 24788 *1, *8-*14.

28

1                                            IV.

2                        MOTION TO STRIKE SURPLUSAGE

3          The above arguments to dismiss the indictment based on the government's failure to

4    comply with Mr. Duarte's Fifth and Sixth Amendment rights is premised on *Covian-Sandoval*

5    having read into section 1326 an additional element—a deportation that occurred at a

6    particular time—that the government must plead to the grand jury and prove to a jury.  To

7    the extent the government argues that *Covian-Sandoval* did not create an additional element,

8    the indictment contains surplusage.  In other words, if the government argues that the timing

9    of a person's deportation is not an element of section 1326, but rather a sentencing factor

10   under subsection (b) of section 1326, the indictment alleges a fact—the timing of a person's

11   deportation—the Supreme Court has clearly held to be decided by a judge.

12         The Ninth Circuit has "repeatedly held that language [in an indictment] that describes

13   elements beyond what is required under statute is surplusage and need not be proved at trial."

14   *Bargas v. Burns*, 179 F.3d 1207, 1216 n. 6 (9th Cir. 1999).  Surplusage in an indictment is

15   subject to being struck at the request of the defendant.  *United States v. Fernandez*, 388 F.3d

16   1199, 1220-21 (9th Cir. 2004).  In this case, if the government argues that the date of a

17   person's deportation is not a required element of section 1326, the indictment contains

18   language beyond that which is necessary to convict Mr. Duarte of violating section 1326.

19   If the date of a person's deportation is not an element of section 1326, then the language in

20   the indictment—"  "It is further alleged that defendant Fidencio Duarte-Hernandez, was

21   removed from the United States subsequent to December 18, 2006."—is surplusage. So too

22   is the government's allegation in the indictment that Mr. Duarte violated section 1326,

23   subsection (b).

24         At one time, the Ninth Circuit considered subsection (b) of section 1326 a separate

25   offense from subsection (a).  *See United States v. Corona-Sanchez*, 291 F.3d 1201, 1203 (9th

26   Cir. 2002) (*en banc*).  This changed, however, following the Supreme Court's decision in

27   *Almendarez-Torres v. United States*, 523 U.S. 224 (1998).  *See Corona-Sanchez*, 291 F.3d

28   at 1203.  In *Almendarez-Torres*, the Supreme Court decided that subsection (b) of section

1   1326 described a sentencing provision, to be determined by a judge, rather than a substantive

2   offense. *See id.* Following *Almendarez-Torres*, the Ninth Circuit rethought the way in which

3   subsection (b) should be viewed, to the extent that indictments and judgements that reflect

4   a violation of both subsection (a) and subsection (b) of section 1326 should have the

5   reference to subsection (b) struck to "unambiguously reflect that the defendant was convicted

6   of only one punishable offense pursuant . . .." *Id.*

7          Although an allegation of a particular date of deportation would likely be an

8   appropriate response on the government's part to the holding of *Covian-Sandoval*, the

9   government here has chosen to include in the indictment an allegation that goes solely

10  towards an allegation under subsection (b) of section 1326.  Indeed, the government has

11  chosen to actually allege a violation of subsection (b) of section 1326 in the indictment.  As

12  *Almendarez-Torres* makes clear, however, Congress clearly intended findings under

13  subsection (b) of section 1326 to made by a judge, rather than a jury.  *Almendarez-Torres*,

14  523 U.S. at 235 ("we believe that Congress intended to set forth a sentencing factor in

15  subsection (b)(2) and not a separate criminal offense).

16         Although the Ninth Circuit is free to overrule its own precedent regarding whether

17  Congress intended a statutory provision to be decided by a judge, rather than a jury, *see, e.g.,*

18  *United States v. Buckland*, 289 F.3d 558, 564-68 (9th Cir. 2002) (*en banc*) (discussing

19  enhanced penalties under 21 U.S.C. § 841), it has not seen fit to overrule the Supreme

20  Court's decision in *Almendarez-Torres.  See, e.g., United States v. Weiland*, 420 F.3d 1062,

21  1079 n. 16 (9th Cir. 2005).  For these reasons, to the degree the government argues that

22  *Covian-Sandoval* did not create an additional element of section 1326, the government has

23  pled in the indictment an allegation that Congress intended to be decided by judge, rather

24

25

26

27

28

1  than a jury.[12]  Therefore, pursuant to Federal Rule of Criminal Procedure 7(d), Mr. Duarte

2  moves to strike this surplusage from the indictment.

3                                              **V.**

4                    **MOTION TO PRODUCE GRAND JURY TRANSCRIPTS**

5          Mr. Duarte moves this Court to compel the government to produce all grand jury

6  transcripts in this case.  *See* U.S. CONST. AMENDS V & VI[13].  Federal Rule of Criminal

7  Procedure 6(e)(3)(E)(ii) allows disclosure "at the request of a defendant who shows that a

8  ground may exist to dismiss the indictment because of a matter that occurred before the grand

9  jury."  Given the arguments raised above, it is clear that "a ground may exist to dismiss the

10 indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P

11 6(e)(3)(E)(ii).  Mr. Duarte requests the Court "authorize disclosure" of the grand jury

12 transcript to allow Mr. Duarte to adequately prepare for trial and to perfect his appellate

13 record.  *See id.*

14

15        [12]  The holdings in *Covian-Sandoval* and *Almendarez-Torres* also render subsection (b) of
   section 1326 unconstitutional.  In *Covian-Sandoval*, the Ninth Circuit held that a jury must determine
16 the timing of a person's deportation to trigger subsection (b)'s enhanced statutory maximum.
   *Covian-Sandoval*, 462 F.3d 1097-1098.  In *Almendarez-Torres*, however, the Supreme Court held
17 that Congress intended subsection (b) to be a sentencing provision to be determined by a judge.
   *Almendarez-Torres*, 523 U.S. at 235.  It is thus clear that subsection (b), as written and construed by
18 the Supreme Court, violates *Apprendi*.

19        [13]  The Supreme Court has found that "[t]he grand jury is an integral part of our constitutional
20 heritage which was brought to this country with the common law.  The Framers, most of them
   trained in the English law and traditions, accepted the grand jury as a basic guarantee of individual
21 liberty . . . the grand jury continues to function as a barrier to reckless or unfounded charges.  'Its
   adoption in our Constitution as the sole method for preferring charges in serious criminal cases
22 shows the high place it held as an instrument of justice.' *Costello v. United States*, 350 U.S. 359, 362
23 (1956).  Its historic office has been to provide a shield against arbitrary or oppressive action, by
   insuring that serious criminal accusations will be brought only upon the considered judgment of a
24 representative body of citizens acting under oath and under judicial instruction and guidance. "
   *United States v. Manduano*, 425 U.S. 564, 571 (1976).  In order to ensure that the criminally accused
25 are safeguarded from reckless and unfounded charges, judges must take their duty to provide
26 guidance seriously and not simply pay lip service to the assurances of the government.  It is curious
   why the government, in this district in particular, fights so hard to keep grand jury proceedings
27 sealed.  Interestingly, in many cases, the "witness" who "testifies" before the grand jury is a border
28 patrol agent who neither participated in the arrest or the investigation.  He is only called to read a
   report which has been prepared by others.  Such a practice does not allow for the considered
   judgment of grand jurors.  Thus, the release of transcripts is appropriate.

                                        21                          07cr3343-JTM

# VI.

## THE COURT SHOULD SUPPRESS MR. DUARTE'S ALLEGED STATEMENTS

**A.      _Miranda_ Warnings Must Precede Custodial Interrogation.**

The Supreme Court has held that the government may <u>not</u> use statements, whether exculpatory or inculpatory, obtained during custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. _Miranda v. Arizona_, 384 U.S. 436, 444 (1966). The law imposes no substantive duty upon the accused to make any showing other than that the statements were taken while the accused was in custody and subject to interrogation. _Id._ at 476. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of her freedom of action in any significant way. <u>Id.</u> at 477; _see also Orozco v. Texas_, 394 U.S. 324, 327 (1969). In _Stansbury v. California,_ 511 U.S. 318 (1994), the Supreme Court stated that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Id.</u> at 323.

When it takes an accused's statement during custodial interrogation, a heavy burden rests on the government to demonstrate that the accused intelligently and voluntarily waived her privilege against self-incrimination. To satisfy this burden, the prosecution must introduce evidence sufficient to establish "that under the 'totality of the circumstances,' the defendant was aware of 'the nature of the right being abandoned and the consequences of the decision to abandon it." _United States v. Garibay_, 143 F.3d 534, 536 (9th Cir. 1998) (quoting _Moran v. Burbine_, 475 U.S. 412, 421 (1986)). The Ninth Circuit has stated that "[t]here is a presumption against waiver." _Garibay_, 143 F.3d at 536. The standard of proof for a waiver of constitutional rights is high. _Miranda_, 384 U.S. at 475; _see also United States v. Heldt,_ 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on the government is great, the court must indulge every reasonable presumption against waiver of fundamental constitutional rights) (citing _Johnson v. Zerbst_, 304 US 458, 464 (1938)). Finally, it should be noted that, since _Miranda_ rests on a constitutional foundation, _see Dickerson v. United States_, 530 U.S.

1   428, 438 (2000), no law or local court rule relieves the government of its burden to prove that Mr.

2   Aispuro voluntarily waived the *Miranda* protections.  *Miranda*, 384 U.S. at 475.

3          The validity of the waiver depends upon the particular facts and circumstances of the case,

4   and include the background, experience, and conduct of the accused.  *Edwards v. Arizona*, 451 U.S.

5   477, 482 (1981); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *see also Garibay*, 143 F.3d at 536;

6   *United States v. Bernard S.*, 795 F.2d at 751 ("a valid waiver of *Miranda* rights depends upon the

7   totality of the circumstances, including the background, experience and conduct of the accused").

8   In *Derrick v. Peterson*, 924 F.2d 813 (9th Cir. 1990), the Ninth Circuit confirmed that the issue of

9   the validity of a *Miranda* waiver requires a two prong analysis: the waiver must be both (1)

10  voluntary; and, (2) knowing and intelligent.  *Id.* at 820.  The voluntariness prong of this analysis "is

11  equivalent to the voluntariness inquiry [under] the [Fifth] Amendment . . . ."  *Id.*  The knowledge

12  prong mandates an inquiry into whether "the waiver [was] made with a full awareness both of the

13  nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*

14  (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *accord Garibay*, 143 F.3d at 436.  Thus,

15  "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal <u>both</u> an uncoerced

16  choice <u>and</u> the requisite level of comprehension may a court properly conclude that the *Miranda*

17  rights have been waived."  *Derrick* at 820 (quoting *Moran v. Burbine*, 475 U.S. at 521) (emphasis

18  in original) (citations omitted)).

19         Here, Mr. Duarte was in custody upon being escorted to the secondary inspection area.

20  Unless and until it shows the agents properly administered the *Miranda* warnings and obtained a

21  knowing and intelligent waiver from Mr. Duarte, the government cannot use evidence obtained as

22  a result of any custodial interrogation that occurred after Mr. Duarte's arrest.  *Miranda*, 384 U.S. at

23  479.

24  **B.    The Government Bears the Burden of Proving that Mr. Duarte's Alleged
        Statements Were Made Voluntarily**

25

26         Even when the procedural safeguards of *Miranda* have been satisfied, a defendant in a

27  criminal case is deprived of due process of law if his conviction is founded upon an involuntary

28  confession.  *Arizona v. Fulminante,* 499 U.S. 279 (1991); *Jackson v. Denno,* 378 U.S. 368, 387

1   (1964).  The government bears the burden of proving that a confession is voluntary.  *Lego v.*

2   *Twomey,* 404 U.S. 477, 483 (1972).      In order to be voluntary, a statement must be the product of

3   a rational intellect and free will.  *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  In determining

4   whether a defendant's will was overborne in a particular case, this Court must consider the totality

5   of the circumstances.  *Schneckloth* at 226; *see also United States v. Bautista-Avila*, 6 F.3d 1360,

6   1364 (9th Cir. 1993).  A statement is  involuntary if it is "extracted by any sort of threats or violence,

7   [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper

8   influence."  *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532,

9   542-43 (1897)); *see also United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981).

10          To meet its burden, the government must demonstrate that Mr. Duarte's statement was <u>not</u>

11  the result of either threats or promises made by the agents, but was made voluntarily.

12  **C.    This Court Must Conduct An Evidentiary Hearing.**

13          Mr. Duarte challenges his statements at secondary inspection and statements made afterward.

14  Accordingly, this Court must conduct an evidentiary hearing to determine whether the government

15  can meet this burden and use Mr. Duarte's statements against him.  18 U.S.C. § 3501.  Since

16  "'suppression hearings are often as important as the trial itself,'" these findings should be supported

17  by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's

18  responsive pleading.  *See United States v. Prieto-Villa*, 910 F.2d 601, 609-10 (9th Cir. 1990)

19  (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)).

20          Unless and until the government demonstrates that statements were made voluntarily, the

21  statements may <u>not</u> be used <u>for any purpose</u> at trial.

22                                        **VII.**

23          **MOTION TO DISMISS INDICTMENT FOR INVALID DEPORTATION**

24  **A. Summary of Argument**

25          The alleged conviction for which Mr. Duarte was removed—arson of garbage, in

26  violation of California Penal Code section 451(d)—is not an "aggravated felony."  By

27  characterizing his prior as an "aggravated felony," the IJ presiding over Mr. Duarte's removal

28  hearing both wrongfully removed Mr. Duarte from the country and mis-advised him as to his

1   eligibility for a number of forms of relief.  Under Ninth Circuit law, this renders Mr. Duarte's

2   removal hearing fundamentally unfair.  The government may not therefore use Mr. Duarte's

3   removal as a basis for its prosecution under 8 U.S.C. § 1326.  Accordingly, Mr. Duarte requests

4   that this Court dismiss the indictment against him.

5   **B. In Mr. Duarte's Case, Arson Should Not Constitute an Aggravated Felony as it Includes**

6   **Burning the Property of No One and Violates *Leocal v. Ashcroft*.**

7        **1. Mr. Duarte's alleged "aggravated felony"**

8        California Penal Code section 451(d) describes the circumstances under which a person

9   may be convicted for arson.[14]  The specific subsection alleged against Mr. Duarte requires force

10  or violence against the property of another.

11       **2. California Penal Code 451(d) Is Over-broad Because it Includes Burning Trash**

12  **That Does Not Belong to Anyone and Is Not Considered Property.**

13       The Ninth Circuit in an unpublished decision has already considered that California Penal

14  Code Section 451 can be over-broad as it includes violations of burning ones own property.

15  *Miranda-Rosales v. Mukasey*, 260 Fed.Appx. 979, 2007 WL 4533439 (C.A.9) (C.A.9,2007).  Mr.

16  Duarte argues that it is also over-broad as it includes burning items that are not the property of

17  anyone, such as trash.   *In re L.T.*, 103 Cal. App. 4th 262 (Cal. 2002).

18       California's determination that trash can be considered property for purposes of the

19  California arson statute is inconsistent with Supreme Court case law in other areas of law.  In the

20  context of the Fourth Amendment, the Supreme Court has repeatedly held that trash left outside

21  for collection bears no expectation of privacy rights.  *California v. Greenwood,* 486 U.S. 35, 39

22  (1988).  Likewise, the California Appellate courts have recognized that trash does not retain its

23  character as personal property of another once it has been discarded.  "By placing them into the

24  garbage, the owner renounces the key incidents of ownership–title, possession, and the right to

25  control."  *Ananda Church of Self-Realization v. Massachusetts Bay*, 95 Cal. App. 4th 1273, 1282

26  (Cal. 2002).  The court denied a claim for conversion of property based on the fact that the

27  property was discarded as waste and was thus abandoned.  *Id*.

28

1    Here, Mr. Duarte allegedly set fire to trash that had been discarded in a trash receptacle

2    on the street or in a parking lot.  TR RPO Judgment 4.   Because that cannot be considered the

3    property of another, California Penal Code Section 451(d) is over-broad in that violations can

4    result from burning something that is not the property of another.

5    Because the California arson statute is over-broad, it is not categorically a crime of

6    violence which renders Mr. Duarte an aggravated felon.  When looking at the facts of this case,

7    Mr. Duarte should not be considered an aggravated felon for having burned trash.

8    **3.  Mr. Duarte's Arson Conviction is not a Crime of Violence Under *Leocal v.***

9    ***Ashcroft* and thus not an aggravated felony.**

10    In 2004, the Supreme Court clarified the statutory meaning of a "crime of violence" for

11    purposes of the "aggravated felony" definition contained in 8 U.S.C. § 1101(a)(43).  *Leocal v.*

12    *Ashcroft*, 543 U.S. 1 (2004).  Under the clarification provided by the Supreme Court, Mr.

13    Duarte's arson conviction is not a "crime of violence" and is thus not an "aggravated felony."

14    "The Immigration and Nationality Act defines an 'aggravated felony' to include 'a crime

15    of violence (as defined in section 16 of Title 18 . . .).'"  *Lara-Cazares v. Gonzales*, 408 F.3d

16    1217, 1219-20 (9th Cir. 2005).  In turn,

17       the term 'crime of violence' means-

18       (a) an offense that has as an element the *use,* attempted *use,* or threatened *use* of

19       physical force *against the person or property of another,* or

20       (b) any other offense that is a felony and that, by its nature, involves a substantial

21       risk that physical force *against the person or property of another may be used in*

22       *the course of committing the offense.*

23    *Id*. (emphasis in original) (citing 18 U.S.C. § 16).

24    "In *Leocal,* the Supreme Court addressed the question whether a conviction under Florida

25    law for driving under the influence of alcohol (DUI) and causing serious bodily qualified [as a

26    "crime of violence"] under § 16.  The Court unanimously held that the conviction did not qualify

27    as a crime of violence."  *Lara-Cazares*, 408 F.3d at 1220 (citing *Leocal*, 543 U.S. at 10-11).  It

28    did so by construing the "the common meaning of the [words] 'use' of force 'against the person'

1   of another[,]" as those words are use in section 16.  *Id.*  As the Supreme Court noted, these terms

2   are most readily understood as requiring some type of active employment of force.  *See id*. at

3   1220-21.  For this reason, the Supreme Court construed section 16 to require "a higher degree of

4   intent than negligent or merely accidental conduct."  *Id.*  (quoting *Leocal*, 543 U.S. at 9).

5        This requirement applies with equal force to both subsection (a) and subsection (b) of

6   section 16.  "The key phrase in § 16(a)—the 'use . . . of physical force  . . . naturally suggests a

7   higher degree of intent than negligent or merely accidental conduct."  *Lara-Cazares*, 408 F.3d at

8   1220 (quoting Leocal, 543 U.S. at 9).  So too under subsection (b).   To qualify as a "crime of

9   violence" under subsection (b), a conviction too must "requir[e] a higher *mens rea* than the

10  merely accidental or negligent conduct involved in a DUI offense.  This is particularly true in

11  light of § 16(b)'s requirement that the 'substantial risk' be a risk of using physical force against

12  another person 'in the course of committing the offense.'"  *Lara-Cazares*, 408 F.3d at 1220

13  (citing and quoting *Leocal*, 543 U.S. at 10-11).  In other words, to qualify as a 'crime of

14  violence' under section 16, a conviction must involve (at least) a higher mental state than

15  "accidental or negligent conduct" on the part of a criminal defendant.  *Id*. at 1221 (citing *Leocal*,

16  543 U.S. at 10-11); *see also id.* at 1221 (applying *Leocal* to a California driving under the

17  influence statute requiring "gross negligence").

18       The crime for which Mr. Duarte was removed—California Penal Code section

19  451(d)—does not meet the definition of a "crime of violence" in 18 U.S.C. § 16.  California

20  Penal Code section 451(d) includes reckless conduct and no mental state for the resulting act.

21  *See People v. Atkins*, 25 Cal. 4th 76, 84 (Cal. 2001)..  It is not an offense that includes an element

22  of use (or attempted use) of force against another, as those phrases were construed by *Leocal*.

23  See id.  Nor does California Penal Code 451(d) involve, "by its nature," "a substantial risk that

24  physical force" will be used, as those terms were construed by *Leocal.  See id*.  To suffer a

25  conviction under California Penal Code 451(d), a person need *not* actively employ force against

26  another in a manner to constitute a crime of violence under § 16.  *Id*.  The California arson

27  statute does not require intent to burn a structure, forest land, or property, rather it only requires

28  an intent to do the act that causes the harm.  *People v. Morse*, 116 Cal. App. 4th 1160, 1163 (Cal.

1   2004).  Thus, someone who intentionally sets leaves on fire, can be convicted of arson under

2   California law if a building is burnt as a result despite no intention of burning the building.  In

3   addition, the term willfully, under the California arson statute "does not require any intent to

4   violate law, or to injure another, or to acquire any advantage." *Atkins*, 25 Cal. 4th at 84.

5        For these reasons, Mr. Duarte's conviction for arson is not a "crime of violence" within

6   the meaning of 18 U.S.C. § 16 and thus not an "aggravated felony." *Id.*; *Leocal*, 543 U.S. at 11.

7   **C. Mr. Duarte's removal hearing was fundamentally unfair**

8        As discussed above, Mr. Duarte's conviction for arson never was an "aggravated felony."

9   As Mr. Duarte was ordered removed from the United States for being an "aggravated felon," Mr.

10  Duarte's removal was violative of due process, thus fundamentally unfair, and cannot serve as

11  the basis for a prosecution under 8 U.S.C. § 1326.

12       "A defendant charged with illegal reentry under 8 U.S.C. § 1326 has a Fifth Amendment

13  right to collaterally attack his removal order because the removal order serves as a predicate

14  element of his conviction." *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1047 (9th Cir.

15  2004) (citing *United States v. Mendoza-Lopez*, 481 U.S. 828, 837-838 (1987)).   To "sustain a

16  collateral attack under § 1326(d), a defendant must, within constitutional limitations,

17  demonstrate (1) that he exhausted all administrative remedies available to him to appeal his

18  removal order, (2) that the underlying removal proceedings at which the order was issued

19  improperly deprived him of the opportunity for judicial review, and (3) that the entry of the order

20  was fundamentally unfair." *Id.; see also Camacho-Lopez*, 450 F.3d at 930 (quoting, in part,

21  *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004).

22       **1.  Mr. Duarte is exempt from § 1326(d)'s exhaustion requirement**

23       Mr. Duarte is exempt from the exhaustion requirement.  Normally, a defendant charged

24  with violating § 1326 who wishes to collaterally challenge his removal must have exhausted any

25  administrative remedies available to him. *See* 8 U.S.C. 1326 (d)(1).  Ninth Circuit law makes

26  clear, however, that such a waiver is invalid if it was influenced by an IJ's mis-advisal. *Ubaldo-*

27  *Figueroa*, 364 F.3d at 1049; *Ortiz-Lopez*, 385 F.3d at 1204 n.2; *United States v. Ahumada-*

28  *Aguilar,* 295 F.3d 943 (9th Cir. 2002).

1    Here, the IJ misinformed Mr. Duarte as to his eligibility for relief from removal.

2    Specifically, the IJ mis-informed Mr. Duarte in two ways: the IJ mis-informed Mr. Duarte that he

3    (Mr. Duarte) was not only removable, but also that the IJ had no choice to remove him, not

4    advising him of any forms of relief despite Mr. Duarte specifically seeking relief.  In this specific

5    context, the Ninth Circuit has excused a defendant from exhausting his administrative rights

6    because of an IJ's mis-advisal that he (the defendant) was removable as an "aggravated felon."

7    *Camacho-Lopez*, 450 F.3d at 930.  As was the case in *Camacho-Lopez*, and due to the IJ's error,

8    Mr. Duarte is excused from § 1326 (d)'s exhaustion requirement.

9        **2. Mr. Duarte was denied judicial review**

10    Similarly, the IJ's failure to inform Mr. Duarte of his eligibility for relief from removal

11    deprived him of an opportunity to seek judicial review of the IJ's removal order.  A defendant

12    seeking to collaterally challenge a deportation under § 1326(d) normally must show that he was

13    improperly denied the opportunity for judicial review.  *See* 8 U.S.C. § 1326(d)(2).  An IJ's failure

14    to inform a person of their eligibility for relief from removal satisfies the requirement that a

15    defendant be denied his opportunity to seek judicial review.  *Camacho-Lopez*, 450 F.3d at 930;

16    *Ubaldo-Figueroa*, 364 F.3d 1042, 1047; *Ortiz-Lopez*, 385 F.3d at 1204 n.2.  In this context, the

17    Ninth Circuit has held that a defendant was denied judicial review because of an IJ's mis-advisal

18    that he (the defendant) was removable as an "aggravated felon."  *Camacho-Lopez*, 450 F.3d at

19    930.  As in *Camacho-Lopez*, and due to the IJ's error, Mr. Duarte was effectively denied judicial

20    review.

21        **3. Mr. Duarte's removal was fundamentally unfair**

22    To successfully challenge the government's use of a prior removal in a § 1326

23    prosecution, a defendant must show that the entry of that removal order "was fundamentally

24    unfair."  8 U.S.C. § 1326(d)(3).  "An underlying removal order is 'fundamentally unfair' if: '(1)

25    [a defendant's] due process rights were violated by defects in his underlying deportation

26    proceeding, and (2) he suffered prejudice as a result of the defects.'"  *Ortiz-Lopez*, 385 F.3d at

27    1204 (quoting *United States v. Zarate-Martinez,* 133 F.3d 1194, 1197 (9th Cir. 1998)).

28    //

1    **i.  Mr. Duarte's removal violated due process**

2    An IJ violates a person's due process rights by failing to inform him or her of their

3    eligibility for relief from removal.  *Camacho-Lopez*, 450 F.3d at 930; *Ubaldo-Figueroa*, 364

4    F.3d 1042, 1047; *Ortiz-Lopez*, 385 F.3d at 1204 n.2.  Here, as in *Camacho-Lopez*, the IJ's error

5    violated Mr. Duarte's due process rights by mis-advising Mr. Duarte and by failing to advise him

6    of forms of relief.  *See Camacho-Lopez*, 450 F.3d at 930.

7    **ii.  Mr. Duarte suffered prejudice at his removal hearing**

8    Mr. Duarte suffered prejudice as a result of this due process violation.  As was the case in

9    *Camacho-Lopez*, Mr. Duarte was only removable for having committed an aggravated felony; as

10   discussed above, Mr. Duarte's prior conviction did not fit that definition.  Thus, Mr. Duarte was

11   removed when he should not have been and clearly suffered prejudice as he was eligible for

12   relief, including cancellation of removal and voluntary departure.  *Camacho-Lopez*, 450 F.3d at

13   930 (emphasis in original).

14   **D.  Summation**

15   Mr. Duarte's due process rights were violated at his removal hearing in 2007.  He

16   suffered prejudice as a result of that due process violation.  The government may not therefore

17   use Mr. Duarte's 2007 removal as a basis for its prosecution under 8 U.S.C. § 1326.  As there is

18   no other removal order on which the government may rely, Mr. Duarte requests that this Court

19   dismiss the indictment against him.

20

21                                      **VIII.**

22                               <u>**CONCLUSION**</u>

23   Mr. Duarte requests this Court grant his motions.

24                                      Respectfully submitted,

25    _/s/ Jodi D. Thorp_
     Dated: August 16, 2008          **JODI D. THORP**
26                                   Attorney for Mr. Duarte
                                     jodithorp@thorplawoffice.com
27

28

                                      30                        07cr3343-JTM